# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| MALIBU BOATS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:13-CV-656-TAV-HBG |
| | ) | |
| NAUTIQUE BOAT COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiff Malibu Boats, LLC's Motion for a Preliminary Injunction [Doc. 8], in which plaintiff seeks a preliminary injunction pursuant to Rule 65(a) prohibiting defendant Nautique Boat Company, Inc. from manufacturing, marketing, or offering boats for sale that are equipped with Nautique Surf System ("NSS"). Defendant filed a response [Doc. 26], opposing plaintiff's motion, to which plaintiff filed a reply [Doc. 31]. The Court held a hearing on this motion on January 6, 2014 [Doc. 35], during which the Court heard oral argument from the parties and took the matter under advisement. For the reasons discussed herein, plaintiff's motion [Doc. 8] will be denied.

## I. Background

This dispute involves several patents in technology intended to modify the wake of a recreational boat in order to make the wake suitable for surfing, whereby a person trails the boat and uses a board to surf the boat's wake [Doc. 1 ¶¶ 7-8]. Plaintiff, a boat

manufacturer headquartered Tennessee, holds three patents for the technology and method used to implement the technology, U.S. Patent No. 8,539, 897, issued September 24, 2013, U.S. Patent No. 8,534,214, issued September 17, 2013, and U.S. Patent No. 8,578,873, issued November 12, 2013 [*Id.* ¶ 10].[1] It is the '897 patent that is the subject of the present motion.

Prior to its invention, plaintiff alleges, individuals who wished to surf the wake created by a boat relied upon the natural wave created by the boat's uneven distribution of weight, whether through the amount of fuel placed in the boat's tank, the use of ballasts, or the placement of riders in the boat [Doc. 9 at 3]. To resolve the problems and inconveniences created by weight discrepancies, plaintiff's engineers developed a mechanical surf system that changed the shape and direction of a boat's wake, using installed structures known as "water diverters" at the boat's stern [*Id.*].[2] Installing these water diverters, and allowing the boat's driver to control them from the helm of the boat, enabled the boat's wake to be manipulated based on water conditions or the wake surfer's preferences [*Id.* at 5]. In order to protect its invention, plaintiff filed provisional patent applications in 2011, which subsequently led to the formal application resulting in the '897 patent.

---

[1] Although plaintiff's original complaint [Doc. 1] only asserted claims for the '897 and '214 patents, plaintiff timely filed an amended complaint following issuance of the '873 patent [Doc. 25].

[2] Throughout their filings and during the hearing on this matter, the parties used the term water diverter interchangeably with the terms "tabs," "interceptors," and "flaps."

2

Plaintiff released its commercialized wake-control system under the name "Surf Gate" in June 2012 [*Id.* at 6]. The system allows the driver of the boat to create a surfable wake at the touch of a button, and transfer the wake from one side to the other, while allowing passengers to sit anywhere on the boat without the need for uneven weight distribution [*Id.*]. Upon its release into the market as a $3,000 option to its line of boats, plaintiff asserts that Surf Gate was purchased by every owner who purchased a Malibu Wakesetter boat [*Id.*].

In early 2013, defendant, a Florida boat manufacturer who directly competes with plaintiff in various geographic markets around the country, announced its "Nautique Surf System" ("NSS"), a system similar to Surf Gate which allows for wake modification [Doc. 9 at 7]. While plaintiff asserts that only these two manufacturers have such wake modification systems, defendant asserts that almost every major boat manufacturer in competition with plaintiff offers a wake surfing boat with some form of technology designed to modify the wake [Doc. 26 at 5]. In describing its own system, defendant contends that unlike plaintiff's and other competitor's systems, NSS uses interceptors that deploy directly into the flow of water, rather than a tab which extends at an angle away from the flow of water [*Id.* at 5]. Defendant also argues that plaintiff did not begin the patent application process until after NSS was released [*Id.* at 7]. Plaintiff asserts that NSS has kept defendant competitive with plaintiff, and has disrupted its opportunity to use Surf Gate to take away market share from defendant and other competitors.

After issuance of the patents-in-suit, plaintiff filed an infringement action in the United States District Court for the Central District of California on September 17, 2013 [Docs. 4-2, 4-3]. Plaintiff voluntarily dismissed the case on October 31, 2013 and filed the present action in this Court on the same day [Doc. 4-5]. On November 1, 2013, defendant filed a declaratory action in the Middle District of Florida, seeking declaratory judgments of non-infringement or invalidity as to plaintiff's patents [Doc. 4-1].[3]

## II.    Standard of Review

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if he believes he will suffer irreparable harm or injury during the pendency of the action. Fed. R. Civ. P. 65. Similarly, 35 U.S.C. § 283 permits courts to issue "injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *LifeScan Scotland, Ltd. v. Shasta Techs.*, 734 F.3d 1361, 1366 (Fed. Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).[4] In determining whether to grant a plaintiff's request for injunctive relief the Court must consider the plaintiff's ability to show the

---

[3] The Court previously issued an Order granting plaintiff's motion to enjoin the later-filed Florida action and denying defendant's request to transfer this case to the Middle District of Florida [Docs. 4, 18, 38].

[4] Motions for preliminary injunction in patent infringement cases are governed by the law developed by the Federal Circuit, given that a preliminary injunction, although a procedural matter, "involves substantive matters unique to patent law." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525-26 (Fed. Cir. 2012).

4

following: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. "'These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.'" *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (quoting *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988)). All four elements, however, must be satisfied for a court to grant a preliminary injunction, *Winter*, 555 U.S. at 20, and it is the movant's burden to prove each of the four elements, *Reebok Int'l Ltd. v. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).

## III.    Analysis

In support of its motion, plaintiff asserts that a preliminary injunction is appropriate in this case in order to prevent defendant from using NSS to take away plaintiff's opportunities to gain market share during the 2014 boat season, denying plaintiff exclusive use of its patented technology and thereby depriving plaintiff of developing an incumbency advantage with would-be Malibu boat purchasers. Boats equipped with NSS infringe the '897 patent, plaintiff submits, because NSS provides for instant wake modification with water diverters that extend beyond the sides of the boat. Defendant argues in response that there are substantial questions as to whether any of its boats equipped with NSS infringe the '897 patent, based on the patent's claim limitations,

5

and similarly substantial questions as to the validity of the '897 patent itself. With regard to plaintiff's arguments of irreparable harm, defendant submits that plaintiff cannot meet its burden at this stage of the litigation and that its arguments in favor of irreparable harm are speculative. Both parties argue that the balance of the equities and the public interest favor their respective positions.

### A. Likelihood of Success on the Merits

In order to demonstrate a likelihood of success on the merits of its case, a plaintiff is required to show that (1) the plaintiff will likely prove that defendant is infringing its patent; and (2) that the plaintiff's infringement claim will likely withstand challenges to the validity and enforceability of the patent. *Amazon.com*, 239 F.3d at 1350 (citing *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)). If a defendant "raises a substantial question concerning either infringement or validity, i.e., asserts an infringement or invalidity defense that the [plaintiff] cannot prove 'lacks substantial merit,'" *id.,* plaintiff is not entitled to the requested relief, *id.* In cases involving multiple patent claims, "to demonstrate a likelihood of success on the merits, the [plaintiff] must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Id* at 1351.

### 1.    Patent Infringement

Patent infringement analysis entails two steps.  A court first "determines the scope and meaning of the patent claims asserted." *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998); *see, e.g. Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." (quotation omitted)).  Then "the properly construed claims are compared to the allegedly infringing device." *Cybor*, 138 F.3d at 1454.

### a.    Claim Construction

Plaintiff asserts that NSS-equipped boats infringe claims 1, 5, 16, 18, 19, and 20 of the '897 patent, of which claims 1 and 16 serve as independent claims while the others serve as dependent claims, respectively.  Claim 1 recites as follows:

> 1.    A boat configured to modify its wake for surfing, the boat comprising:
> A hull compromising port and starboard side strakes, a bottom, a transom aft said side strakes, and a longitudinal axis, wherein said hull moves through water, water flows along the port and starboard side strakes and the beyond the transom to at least in part form a first wake; starboard and upright water diverters each movable between a first position and a second position, said second position of said starboard water diverter laterally extending beyond said starboard side strake at the transom substantially perpendicular to said longitudinal axis of the hull, and said second position of said port water diverter laterally extending beyond said port side strake at the transom substantially perpendicular to said longitudinal axis of the hull, wherein when said hull moves through water, said starboard diverter in said second position redirects water passing along said starboard side strake as said water moves beyond said transom to produce a port side surf wake different from said first wake and wherein when said hull moves through water, said port diverter in said second position redirects water passing along said port side strake as said water

moves beyond said transom to produce a starboard side surf wake different from said first wake and different from said port side surf wake.

['897 patent, col. 14 ll. 26-51].

Similarly, claim 16 discloses the following:

16.     A surf boat configured to create a wake surfable by a wake surfing rider, the surf boat comprising a hull comprising boat and starboard side strakes, a bottom, a transom aft said side strakes, a longitudinal axis, and a plurality of wake modifying devices including a pair of upright water diverters each laterally extendable beyond one of said starboard or port side strakes at the transom substantially perpendicular to said longitudinal axis of said hull of said boat and laterally retractable behind said transom, said extension and said retraction capable of occurring while said surf boat moves through water.

['897 patent, col. 16, ll. 21-31].  There are three terms used in both claims 1 and 16 of which the parties dispute the meaning: side strake; substantially perpendicular; and surf wake.

In undertaking claim construction at the preliminary injunction stage, "a district court does not have to conduct a comprehensive and final claim construction." *Shuffle Master, Inc. v. VendingData Corp.*, 163 F. App'x 864, 867 (Fed. Cir. 2005).  Instead, "[d]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enter., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).  "A district court therefore is at liberty to change the construction of a claim term as the record in a case evolves . . . ." *Transonic Sys., Inc. v. Non–Invasive Med. Tech. Corp.*, 75 F. App'x 765, 774 (Fed. Cir. 2003).  Because a court must determine whether the movant is likely to prevail on the merits, however, "if that question turns on a

contested issue of claim construction, the court must give the claim construction issue the attention necessary to determine the likelihood of success." *Shuffle Master*, 163 F. App'x at 868.

When construing a claim's terms, the words of a claim are generally afforded their ordinary and customary meaning, that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. When the meaning of a claim term as understood by persons of skill in the art is not immediately apparent, courts look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)). Such sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quotation omitted). As part of a "fully integrated written instrument," however, claims must be read in view of the specifications set forth in the patent, which is often "'the single best guide to the meaning of a disputed term.'" *Id.* at 1315; *see, e.g. Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (1998) (stating that "[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history").

### 1. **"Side Strake"**

Defendant contends that the term "side strake," a limitation found in both claims 1and 16, should be interpreted as a strip molded or attached to the side of the hull [Doc. 26 at 17]. This conclusion is based in part on defendant's argument that if the term side strake merely refers to the starboard or port side of the hull, then side and strake would have the same meaning, contrary to the principle that all the limitations of a claim should have meaning [*Id.* at 18 (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991)]. Defendant also relies upon extrinsic evidence for its proposed definition of side strake, including owner's manuals from plaintiff and competing manufacturers, as well as expert testimony. Plaintiff argues that the term should be construed to refer to the exterior side surface of the hull, referring to figures in the specification as well as the prosecution history.

Having reviewed the specification of the patent, along with the relevant prosecution history, the Court disagrees with defendant's narrow interpretation and, at this time, declines to construe the term side strake as referring to a raised strip molded or attached to the side of the hull. Rather, as a matter of preliminary construction only, the Court defines the term side strake to mean the exterior side surface of the port or starboard side of the hull. This broader interpretation is consistent with the use of the term side strake in the specification and in the figures corresponding with the specification. *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (noting that the specification is "the primary basis for construing the claims").

10

Figure 1 of the '897 patent, which depicts an exemplary embodiment of a wake surf system, labels the starboard side strake as 44s, which does not appear to depict or show a strip molded or attached and protruding from the surface of the boat itself ['897 patent, Fig. 1]. Figure 3 similarly depicts a rear view of a boat equipped with the surf wake system and the corresponding specification teaches that "a side edge is the intersection of the transom with either a port side strake 44p or a starboard side strake 44s . . ." [*Id.*, col. 5 ll. 29-31]. Figure 3 does not depict a molding or strip intersecting with the transom of the boat, but appears to depict where the side surface of the hull intersects with the boat's rear. Figure 4 depicts the portside strake from above, showing a smooth surface area intersecting with the boat's transom, and, Figure 5, which depicts the port and starboard side edges from above, also indicates that the side strake is in fact the exterior side surface of the hull. In addition, the specification teaches that "[e]ach upright water diverter may be pivotally mounted to the directly to the transom or a respective side strake," [*Id.*, col. 2 ll. 33-34], and Figure 17 depicts an embodiment of the patent whereby a water diverter is mounted to the side of the hull. While defendant argues that the starboard and port sides are referenced independent of the strakes, the terms "port side" and "starboard side" appear to be used to not only refer to the physical side of the boat, but also used to indicate direction. For example, Claim 1 teaches that when the starboard water diverter is extended, the boat's movement "produce[s] a port *side* wake different from said first wake," and when the port diverter is extended, "water moves beyond said transom to produce a starboard *side* wake different from said first wake and different

11

from said port *side* surf wake" [*Id.*, col. 14 ll. 45-50 (emphases added)]. Defendant has not shown at this time that plaintiff's proposed definition of side strake would render any language in the claims superfluous, in light of the specification.

Referring to the prosecution history of the '897 patent confirms that, within the context of the patent, a side strake refers to the exterior side surface of the hull. During the application process, the patent examiner provisionally rejected plaintiff's application, based in part on U.S. Patent 6,012,408, issued January 11, 2000, which patented a wake control apparatus. Specifically, the patent examiner found that the '408 patent disclosed some of the same subject matter, including "hull, side strakes, [and] port and starboard upright water diverters . . ." [Doc. 27-5]. After an interview with plaintiff, the patent examiner later concluded that the '408 patent did not disclose water diverters that laterally extend "beyond the port and starboard side strakes" [*Id.*]. As the '408 patent and corresponding figures do not depict a molding or strip attached to the hull of a boat, it appears that the patent examiner understood "side strake" to refer to the side surface of the hull. The Court concludes that the prosecution history reinforces plaintiff's position that, in the context of the '897 patent, side strake refers to the exterior side surface of the hull.

The Court also finds that defendant's extrinsic evidence does not outweigh the intrinsic evidence in providing a definition of the term side strake. *See Phillips*, 415 F.3d at 1317 ("[W]hile extrinsic evidence 'can shed useful light on the relevant art' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of

12

the claim language." (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). While defendant references one of plaintiff's owner's manuals, which define a "lifting strake" as a strip molded or attached to the bottom surface of the hull designed to create lift [Doc. 27-12], this does not foreclose the idea that a side strake means the side surface of the hull within the context of the '897 patent [*See* Doc. 31-3 ¶ 14]. This is also true of the Volvo QT Trim System installation manual [Doc. 26 at 13], which similarly depicts what is termed a "strake" as a strip attached to the bottom of the hull, unlike the figures in the '897 patent, which highlight the side of the hull. The Court similarly concludes that the expert testimony offered by defendant does not reconcile its proposed definition of the term "side strake" with the use of that term in the actual patent itself so as to rebut the intrinsic evidence. *See Kara Tech. Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) (noting that "extrinsic sources like expert testimony cannot overcome more persuasive intrinsic evidence"). Thus, as a matter of preliminary construction, the Court adopts plaintiff's definition of the term side strake and concludes that one of ordinary skill in the art would construe a side strake as referring to the exterior side surface of the hull.

### 2. "Substantially Perpendicular"

Defendant next argues that the term "substantially perpendicular" in Claims 1 and 16, related to the angle of the water diverters, should be interpreted to mean "within 5 degrees of perpendicular." This interpretation is based on the prosecution history of the '897 patent, wherein plaintiff attempted to distinguish its invention from the '408 patent

13

previously discussed, as well as language in the specification reciting the angles of flaps in five-degree increments. As the NSS plates have an angle of 10 degrees from perpendicular or greater, depending on the model to which they are attached, defendant contends that none of the NSS-equipped boats infringe the '897 patent. Plaintiff argues that the term should be given its ordinary meaning, to mean approximately perpendicular.

The Federal Circuit has noted that "the term 'substantially' is a descriptive term commonly used in patent claims 'to avoid a strict numerical boundary to the specified parameter.'" *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (quoting *Pall Corp. v. Micron Seps.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995) (noting that the meaning of the word "about" depends on the technological facts of the particular case)). Although the definition of words of approximation may vary depending on the context in which they are used, when the evidence does not attach a special meaning, courts have given the term its plain English meaning. *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004) (noting that "[t]he term 'substantial' is a meaningful modifier implying 'approximate,' rather than 'perfect'"); *see, e.g. Aventis Pharm. Inc. v. Amino Chem. Ltd.*, 715 F.3d 1363, 1375-77 (Fed. Cir. 2013) (defining "substantially pure" as meaning "largely but not wholly," which was "faithful to the specification's silence regarding numerical precision," while noting that "the presumption is that claim terms should be given their ordinary and customary meaning . . . and not a restrictive construction unless there is clear evidence to support it in the intrinsic evidence, or a broader meaning is specifically disclaimed during prosecution" (quotations

14

omitted)); *3M Co. v. Avery Dennison Corp.*, Civil No. 10-2630, 2012 WL 1004865, at *6 (E.D. Minn. Mar. 22, 2012) (construing "substantially orthogonally" as meaning "approximately perpendicular").

The language from the '897 patent upon which defendant relies for its interpretation of substantially perpendicular comes from a section discussing the manner in which the water diverters may be held in one or more interim positions. Specifically, in relevant part, the patent teaches as follows:

> One will appreciate that the surf wake system of the present invention may be configured to hold the flaps in one or more interim positions between their respective outward and neutral positions. For example, the surf wake system may be configured to hold the flaps at 0˚, 5˚, 10˚, 15˚, 20˚, 25˚, 30˚, and etc. relative to the centerline.

['897 patent, col. 6 ll. 53-58]. Based on this language, defendant argues that "[i]f 5˚ increments create a distinction to one of ordinary skill, the measurement of perpendicular should not exceed this unit of measurement" [Doc. 26 at 19]. Defendant, however, does not explain how this language from the specification, which does not discuss the term substantially perpendicular, nor states that five degrees should be used as a unit of measurement, requires such a narrow construction. The Court finds this conclusion to be unsupported by the intrinsic evidence, particularly in light of the fact that it would read a limitation into the claim that was likely unintended by the '897 patent's inventors. *See Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("Because the claims are best understood in light of the specification of which they are a part . . . courts must take extreme care when ascertaining the proper scope of the claims,

15

lest they simultaneously import into the claims limitations that were unintended by the patentee.").  Although the words of the patent do not provide a definition for substantially perpendicular, the specification assists in providing context to the term by indicating the purpose behind the water diverter's angular placement.  The '897 patent teaches that "the system may be configured to allow the flap to laterally extend beyond the strake substantially perpendicular to the longitudinal axis of the watercraft in order to redirect and/or deflect water passing along the water craft as it moves beyond the transom" ['897 patent, col. 6 ll. 40-45].  It appears to the Court that an angle of more than 5 degrees from perpendicular would still accomplish the invention's goal of manipulating a surf wake, as indicated by plaintiff's expert, Mr. Kevin Breen, in his supplemental declaration filed with plaintiff's reply brief [Doc. 31-3 at 11].  The specification language, then, does not prohibit a definition of "substantially perpendicular" that exceeds five degrees from perpendicular.

Defendant also argues that the prosecution history indicates plaintiff disclaimed any angle greater than five degrees from perpendicular in order to prevent the '897 patent application's rejection on the basis of anticipation.  As previously discussed, during the course of the application process, the patent examiner provisionally rejected the '897 application based on the '408 patent, which disclosed the use of "hydrofoils" to adjust the trim of a watercraft, thereby raising or lowering the level of the wake produced ['408 patent, col. 2 ll. 18-20].  The summary of the '408 patent teaches as follows:

> The present apparatus if [sic] is attachable to the watercraft such that each of the hydrofoils is pivotally movable by a respective one of the

16

actuators about an axis which extends in non-perpendicular relation to the axis of the watercraft (e.g., in non-parallel relation to the outer surface of the transom). As such, rather than extending perpendicularly relative to the longitudinal axis of the watercraft or boat, the axes about which the hydrofoils pivot extend angularly relative to the longitudinal axis and, in the case of a boat, angularly relative to the outer surface of the transom thereof.

[*Id.*, col. 2 l. 63, col. 3 ll. 1-8]. The hydrofoils discussed in the summary, which allow for wake modification, are attached to a fin which attaches to the moving support members, as depicted in Figure 1, with the hydrofoils labeled as 24, and the fins labeled as 30, respectively [*Id.*, Fig. 2]. It is these fins that the patent examiner originally held to be prior art, referring to them as water diverters in the pre-interview communication [Doc. 27-5]. In response, the patentees argued that the fins were not extended beyond the strake at the transom and did not extend laterally substantially perpendicular to the longitudinal axis of the hull. The patent examiner agreed, noting after an interview with the patentee that the water diverters/fins of the '408 patent did not extend laterally beyond the strake at the transom [Doc. 27-17]. At this time, the Court does not find sufficient evidence from the prosecution history to show that plaintiff disclaimed or otherwise waived its claim to any non-perpendicular angle as to the '897 patent, and finds no evidence that plaintiff intended to disclaim any angle exceeding five degrees. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) (noting that the court requires "the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer" (citations omitted)).

In light of the lack of sufficient intrinsic or extrinsic evidence to the contrary, at this time the Court finds it appropriate to give the term substantially its ordinary meaning and define substantially perpendicular to mean approximately perpendicular.

### 3.    "Surf Wake"

The third term the parties dispute the meaning of is "surf wake," as used in claims 1, 5, and 19.[5]  Defendant argues that surf wake is neither defined nor a term of art, and contends that wakes of all shapes and sizes have been surfed by enthusiasts on various types of boats.  In addition, defendant submits that the prosecution history similarly fails to present a definition of the term.  Because the term cannot be defined, defendant contends, plaintiff's patent is in valid for indefiniteness.  Plaintiff responds that the term is amenable to construction, and proposes that the term be construed to mean "a wave suitable for surfing whose face is substantially smoother than a face of another wave that eventually diverges from the first" [Doc. 31 at 21].

A patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.  The definiteness requirement "ensure[s] that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  Claims are invalid for indefiniteness when they are "not

---

[5] Although defendant argues that the inability to define surf wake renders the '897 patent invalid, the Court finds it appropriate to address this argument as part of its claim construction, given that the general principles of claim construction apply in the face of an allegation of indefiniteness. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007) (quotation omitted).

18

amenable to construction or insolubly ambiguous." *Id.*; *see, e.g. Young*, 492 F.3d at 1346 ("Indefiniteness requires a determination whether those skilled in the art would understand what is claimed."). "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001), the claim is sufficiently clear to avoid invalidity on indefiniteness grounds.

Turning first to the claim language of the '897 patent, the Court notes that the claim language does not provide an explicit definition for the term, although claim 1 indicates that a "surf wake" is different from a "first wake," and occurs when one of the water diverters is in its second position, extended beyond the starboard side strake ['897 patent, col. 14, ll 32, 45-51]. The specification provides more detail as to what the patentees meant by the term surf wake, teaching, in relevant part:

> Turning to FIG. 5(b), when a starboard surf wake is desired, port side flap 33p is positioned in an outward position while the starboard side flap 33s remains in a neutral position. Since the port side flap is in an outward position and thus extends beyond the port side strake 44p, waves on the port side are redirected, which facilitates constructive interference of converging waves to form a larger starboard wake with a higher peak and smoother face that is suitable for starboard surfing, such as shown in FIG. 6(b). Comparing to the non-enhanced wake of FIG. 6(a) with the starboard wake shown in FIG. 6(b), it is evident that surf wake system 32 modified and/or enhanced the wake with a smooth face and a relatively high peak.

['897 patent, col. 8, ll. 33-45].

Figures 6(a), 6(b), and 6(c) display the differences between the wake created by the boat without either diverter deployed versus the wake created when one of the

diverters is deployed. In each instance, the wake opposite of the deployed diverter, the "surf wake," is noticeably smoother, longer, and has a higher peak than the wake with the deployed diverter [*Id.*, Figs. 6(a), 6(b) & 6(c)]. Thus, the language of the patent shows that the term surf wake is amenable to construction, and may be defined, at the very least, as a wake created by the extension of a water diverter which is substantially smoother, larger, and with a higher peak than a non-enhanced wake. *Cf. Datamize*, 417 F.3d at 1348 (finding that the term "aesthetically pleasing" was incapable of definition because there was no workable objective standard). While the Court need not maintain this preliminary construction through the course of the litigation, the Court finds that the term surf wake is amenable to construction, based on the specification and the figures contained therein.

In support of its position that the term is indefinite, defendant also submitted an affidavit from one of its sponsored athletes, who indicated that any wake created by a boat may be surfed, and that the suitability of a given wake depends on the preferences of the individual surfer [Doc. 27-11, ¶¶ 8-9]. This extrinsic evidence, however, does not support the idea that the term "surf wake" as used in the patent is not amenable to construction, particularly in light of the language of the specification, and despite the fact that some in the industry may disagree with the meaning as derived from the patent itself. *Exxon*, 265 F.3d at 1375; *see also Kara*, 582 F.3d at 1348 (noting that extrinsic evidence cannot overcome more persuasive intrinsic evidence). Thus, the Court finds that defendant has not raised a substantial question of indefiniteness as to the term surf wake.

20

**b.      Comparison of NSS With '897 Claims**

In support of its argument that it could show a likelihood of success on its patent infringement claim, plaintiff submitted the declaration of its expert, Mr. Kevin Breen, who conducted field tests with an NSS-equipped boat, defendant's G23 model [Doc. 9-2].  As to the limitations in claims 1 and 16, referring to the structural elements of the boat, Mr. Breen found that the G23 had a hull comprising port and starboard side strakes, a bottom, a transom aft said side strakes, and a longitudinal axis [*Id.* at 10, 27].  The NSS includes two, adjustable, metal plate-like structures that are affixed to the transom, satisfying the limitations in claims 1, 5, 16, and 18 that the boat must have two "upright water diverters" movable between "a first and second position," as well as intermediate positions [*Id.* at 13-14, 29, 36].  The G23 model's NSS diverters, when in second position, extended laterally beyond the starboard side strake at the transom at an angle of seventeen degrees toward the bow, meaning it has an angle of seventy-three degrees in relation to the longitudinal axis of the hull [Doc. 26 at 26].  Mr. Breen concluded that the water diverters extended substantially perpendicular to the longitudinal axis [Doc. 9-2 at 17].  When moving the test boat through the water, Mr. Breen demonstrated that, depending on the extension of the water diverters, deployment of the diverter on either the port or starboard side of the boat created wakes that differed from each other, depending on which diverter was deployed, and differed from the wake created by the boat alone, as required in claims 1 and 19 [*Id.* at 20-22, 39].  As to claim 20, which claims the system's ability to retract the water diverters when the boat is travelling above

21

a pre-determined speed, Mr. Breen noted that the water diverters on the NSS-equipped boat retracted when the boat reached 13 miles per hour [*Id.* at 41].

Based in part upon the analysis of Mr. Breen, and upon the Court's independent comparison of NSS with the claims of the '897 patent, the Court concludes that plaintiff has shown a likelihood of success on the merits of its patent infringement claim for purposes of assessing plaintiff's injunction request.

## 2. Validity

Defendant next argues that plaintiff cannot show a likelihood of success on the merits because the '897 patent is invalid. In addition to the indefiniteness argument, as previously discussed, defendant submits various prior art references which allegedly anticipate the claims of the '897 patent or which render certain claims obvious.

As the Court noted at the outset of its analysis, a patentee seeking a preliminary injunction must not only show a likelihood of success as to infringement but must also show "that it will likely withstand challenges, if any, to the validity of the patent . . . in light of the burdens and presumptions that will inhere at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). At the preliminary junction stage, the patent is entitled to the same "presumption of validity" that would inhere at trial. *Id.* at 1377 (citing *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998)). If "the alleged infringer responds to the preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial." *Id.*

22

The patentee must then respond with evidence to show that, "despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue." *Id.* In *Titan*, the Federal Circuit characterized the question before the court as "whether it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is valid." *Id.* at 1379.

Regarding the anticipation of a patent claim, 35 U.S.C. § 102 notes that a person is entitled to a patent unless "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention . . . ." 35 U.S.C. § 102(a)(1). "A single prior art reference anticipates a patent claim if it expressly or inherently describes each and every limitation set forth in the patent claim." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). "To establish inherency, the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.'" *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (quoting *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991)). "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* (quotation omitted).

Similarly, a patent may be invalid for obviousness under 35 U.S.C. § 103. The Supreme Court has dictated a flexible approach for determining whether a patent is obvious, which includes analysis of the following: the scope and content of the prior art;

differences between the prior art and the claims at issue; and the level of ordinary skill in the art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). "'Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.'" *Id.* (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 18 (1966)).

### a. U.S. Patent No. 6,520,104

The first prior art reference defendant relies upon in support of its anticipation argument is U.S. Patent No. 6,520,104, issued February 18, 2003. The '104 patent discloses an arrangement and method to control the movements and course of a high-speed vessel hull ['104 patent, col. 1]. The '104 patent was intended to resolve the difficulties in maintaining course stability among high-speed, high-transport capacity vessels without sacrificing speed or fuel efficiency [*Id.*, col. 2 ll. 13-22]. In order to obtain better control over the movement of the boat, the '104 patent uses what are termed "flaps" arranged so as to be capable of being adjusted at an angle in relation to water flow relative to the aft side surface of the vessel hull [*Id.*, col. 2 ll. 47-54]. Defendant contends that these flaps, which it refers to as water diverters, move laterally beyond the side strakes at an angle substantially perpendicular to the longitudinal axis of the ship, doing so while the ship is in motion. Defendant also argues that the '104 patent either expressly or inherently discloses wake modification, so that the '104 patent anticipates the claim limitations set forth in claims 1 and 16. The Court disagrees.

24

In arguing that the '104 patent discloses the wake-modification limitations of claims 1 and 16, defendant references a line from the specification which notes that a "spray strip" used on the vessel's hull "prevents water splashing upward towards the deck of the vessel" [*Id.*, col. 5 ll. 10-11]. The Court does not find that this line discloses use of the flap members to modify the wake of a boat, as it does not refer to the flap members, nor disclose that it is the water from the flap members necessitating the spray strip, rather than the movement of the hull itself. Similarly, the Court finds that defendant has not shown, at this time, that wake modification, for the purposes of claim 16, is "necessarily present" in the '104 patent, rather than a mere probability or possibility, to support the argument that the '104 patent inherently anticipates claim 16. *Robertson*, 169 F.3d at 745. The fact that the wake may be different when the water diverters of the '104 patent are deployed is insufficient to support a finding of anticipation, and the Court does not find that defendant's expert testimony in this regard is such that it raises a substantial question of anticipation at this time. In response to defendant's arguments, plaintiff's expert submitted testimony that the boat discussed in the '104 patent would be going at high speeds to where surfing would be untenable, so that the '104 patent could not anticipate wake modification for surfing. With regard to claims 1, 5, and 19, defendant does not reference any language from the claims of the '104 patent disclosing the creation of a surf wake, as the Court has defined that term for purposes of this motion. Thus, although defendant has raised a question of validity in light of the '104 patent, the Court finds, at this time, that plaintiff will likely overcome this challenge as to claims 1,

25

5, 16, and 19, although this conclusion does not dictate whether defendant may be able to show invalidity later at trial on the merits.[6]

### b.    QL Boat Trim System

Defendant next submits two publications from the QL Boat Trim System by Volvo (the "QL system"), which defendant submits has been on sale to the public at least 2005, as evidence that the QL system anticipates the claims of the '897 patent.[7]  One of the submitted documents, a brochure for the QL system [Doc. 27-19], claims that the purpose of the QL system is to give boat riders a smoother ride by altering the placement of the bow or by listing the boat to port or starboard [*Id.* at 3-4].  The brochure and instruction manual [Doc. 27-18] illustrate that this effect is achieved by the use of "interceptors" attached to the transom of the boat, which deploy vertically into the water [Doc. 27-19 at 3].  Defendant argues that these interceptors act as upright water diverters and are extendable beyond the strakes, inherently disclosing wake modification.  Thus, defendant claims, the QL documents anticipate claims 1 and 16 of the '897 patent.

In support of its argument that the QL system uses diverters that extend beyond the strakes, defendant references Figure 8 of the instruction manual which depicts the

---

[6] Because the Court finds that defendant has not presented a substantial question as to anticipation of claims 1, 5, 16, or 19, the Court need not address defendant's obviousness arguments with respect to claim 20, as plaintiff need only show that one of the allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer to show a likelihood of success on the merits.  *Amazon.com*, 239 F.3d at 1351.

[7] While plaintiff argued in its brief that defendant had not presented sufficient evidence to show that the QL system qualified as "prior art" under the statute, defendant submitted the affidavit of one of Volvo's employees, who testified that the QL system has been on sale to the public since 2005, and that the submitted documents were published prior to 2010 [Doc. 33-1].  Thus, for purposes of this motion, the Court finds that the QL system qualifies as prior art.

26

placement of one of the interceptors in relation to what is referred to as a "strake" [Doc. 27-18 at 8]. The manual recommends that "the interceptor units shall preferably be installed next to these strakes" [*Id.*]. Defendant's argument that this figure discloses a water diverter "laterally extending beyond" a side strake is based on its proposed definition of strake, that is, a molding or strip attached to the side of the hull, which the Court has declined to adopt at this time for the reasons previously discussed. The interceptors of the QL system do not extend horizontally beyond the side strakes, or the side surfaces of the boat, but rather appear to extend vertically at the end of the transom, although, as plaintiff's expert noted, neither document discloses an extended interceptor [Doc. 31-3 at 24]. In addition, the placement of the interceptors as they are depicted in Figure 8 does not appear to enable them to be extendable substantially perpendicular relative to the longitudinal axis of the hull, as they are placed based on the angle of the hull. From review of these documents, and upon review of both defendant's and plaintiff's expert testimony with regard to the QL system, the Court concludes that plaintiff has shown a likelihood of success in overcoming this anticipation argument with regard to claims 1 and 16, as well as the relevant dependent claims. *See Trintec*, 295 F.3d at 1296 (noting that dependent claims were not anticipated when independent claim was not anticipated).

### c.    NSS as Prior Art

The third prior art reference defendant relies upon in support of its anticipation argument is the NSS itself, based on defendant's argument that plaintiff is not entitled to

the priority of its earlier applications. Defendant argues that the earlier filings disclosed pivotally-attached flaps, rather than an interceptor-system similar to the NSS, and that plaintiff has not shown that it is entitled to priority. In response, plaintiff submitted U.S. Patent Application No. 13/545,969, filed July 10, 2012, of which the '897 patent is a continuation, and which itself is a continuation of U.S. Provisional Patent Application No. 61/559,069, filed November 12, 2011 [Doc. 36-1].

"'It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.'" *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) (quoting *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995)). The disclosure of the prior application must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought," the inventor possessed the invention. *Id.* (quotation omitted). "While a prior application need not contain precisely the same words as found in the asserted claims . . . the prior application must indicate to a person skilled in the art that the inventor was 'in possession' of the invention as later claimed." *Id.* (citing *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985)).

The '969 application discloses the use of a "pair of upright water diverters including a port diverter and a starboard diverter, each independently movable from a neutral position to a deployed position in which a respective water diverter extends outboard of a transom of the water craft to deflect water traveling along the hull of the

watercraft and past the transom" [Doc. 36-1 at 6]. The '969 application teaches that the water diverter "may extend outboard beyond a side strake of the watercraft to deflect water traveling along the side strake and past the transom" [*Id.* at 7]. Similarly, the '969 application instructs that "the system may be configured to allow the flab to laterally extend beyond the side strake substantially perpendicular to the longitudinal axis of the watercraft in order to redirect and/or deflect water passing along the water craft as it moves beyond the transom" [*Id.* at 14], and that the water diverters may be configured for a variety of angular ranges and interim positions [*Id.*]. With regard to the wake created by operation of the port side water diverter, the application notes that the disruption "facilitates constructive interference of converging waves to form a larger starboard wake with a higher peak and smoother face that is suitable for starboard surfing" [*Id.* at 23]. The accompanying figures largely mirror the figures ultimately contained within the '897 patent, displaying a pair of water diverters attached at the transom [*Id.* at 31] and the various wakes created by the retraction/extension of the water diverters [Doc. 36-1 at 36], while disclosing a watercraft with a transom, bottom, side strakes, and longitudinal axis [*Id.* at 33]. Based on the record before it, the Court finds that plaintiff has shown that the '969 application discloses the limitations of claims 1 and 16, so that the '897 patent is entitled to the priority date of the '969 application.

The Court reaches the same conclusion with respect to the '069 provisional application, which similarly discloses a "surf wake system" with a pair of upright water diverters, "each independently movable from a neutral position to an outward position in

29

which a respective water diverter extends outboard beyond a transom and/or side strake of the watercraft and/or outboard for deflecting water traveling past the transom and/or side strake" [*Id.* at 54]. The '069 provisional application discloses that the "system may be configured to allow the flap to laterally extend beyond the side strake substantially perpendicular to the longitudinal axis of the watercraft in order to redirect and/or deflect water passing along the water craft as it moves beyond the transom" [*Id.* at 58]. The application's specification, along with the corresponding figures, similarly discloses a surf wake with a smooth face and high peak [*Id.* at 61]. Although the language may differ, the Court concludes that the person with reasonable skill in the art could conclude that plaintiff "possessed" the invention as of the filing of the '069 provisional application, and is thus entitled to the priority date of the '069 application. At this time, the Court cannot conclude that plaintiff will not be able to overcome the anticipation argument as to the NSS.

Accordingly, the Court concludes that plaintiff has shown that it is likely to be successful on its infringement claim, and, although defendant has raised various arguments as to the '897 patent's validity which may be shown to have merit as the record becomes more fully developed, the Court also concludes that plaintiff has shown it is likely to withstand any challenge as to validity presented by defendant, so that this first factor favors injunctive relief.

### B. Irreparable Harm

The fact that plaintiff has shown a likelihood of success on the merits is insufficient, on its own, to warrant a preliminary injunction, as plaintiff must also "make a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elec. Co., Ltd. (Apple I)*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (citation omitted); *see, e.g. Amazon.com*, 239 F.3d at 1350 (noting that "case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, i.e., likelihood of success on the merits and irreparable harm). At the preliminary injunction stage, "irreparable harm consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l, Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). At the same time, however, the fact that damages could be computed "does not always preclude a finding of irreparable harm." *Celsis In Vitro, Inc. v. Cellzdirect, Inc.*, 664 F.3d 922, 930 (2012). "Price erosion, loss of goodwill, damage to goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Id.* (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)). In addition to showing irreparable harm, plaintiff must also establish "that a sufficiently strong causal nexus relates the alleged harm to the alleged

infringement." *Apple Inc. v. Samsung Elec. Co., Ltd. (Apple II)*, 695 F.3d 1370, 1374 (2012).

In arguing injunctive relief is warranted under this factor, plaintiff offers several "irreparable harms," including: (1) diminishing the value of Surf Gate in gaining market share; (2) lost future sales; (3) damage to its reputation and loss of goodwill; and (4) price suppression. Prior to evaluating these alleged harms, however, the Court finds it appropriate to discuss the market in which defendant and plaintiff compete. Plaintiff contends that the market for inboard water-sports boats is a "niche market" dominated by plaintiff (24% market share in 2012, along with 6% of a related brand), defendant (approximately 15% market share), MasterCraft (22%), and Skier's Choice (15%), respectively [Doc. 9-9 ¶ 6]. Defendant submitted testimony indicating that other relevant boat manufacturers include Centurion, Tigé, Epic, and Sanger [Doc. 27-7 ¶ 33]. These other manufacturers, defendant submits, each offer respective wake surfing systems that range from tabs, such as used by MasterCraft, to singular plates, such as used by Centurion [*Id.* ¶¶ 34, 38]. While defendant's evidence suggests that these wake modification systems can similarly be controlled based on boater preferences and can be easily switched, plaintiff contends that only Surf Gate and NSS offer the ability to control the shape of a wake at the push of a button. Defendant's expert opines that wake surfing systems make up over 94% of the inboard water-sports boat market [*Id.* ¶ 33]. Within this market, plaintiff submits, consumers exhibit a high degree of "brand loyalty" and

will typically trade-in their boats approximately every five years [Doc. 9-8 ¶ 28]. In a given year, manufacturers will compete for approximately 6,000 boat sales [*Id.* ¶ 27].

Plaintiff thus argues that the presence of NSS is harming plaintiff's ability to increase market share with its Surf Gate technology. Defendant argues that plaintiff cannot show irreparable harm by touting the competitive advantages of Surf Gate because Surf Gate does not encompass the '897 claims and plaintiff is not currently practicing the '897 claims. While plaintiff correctly points out that it need not practice its invention in order to show irreparable harm, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 701 (Fed. Cir. 2008), the Court notes that the proper focus for analysis is on the harm caused by NSS, as the infringing product, which may include the harmful effect NSS has on plaintiff's technology which is not disclosed in the '897 patent. In other words, the proper focus is the manner in which the presence of NSS is increasing defendant's market share at plaintiff's expense, rather than focusing on the manner in which Surf Gate has increased plaintiff's market share, which may not accurately reflect the harm caused by NSS.

In support of its position, plaintiff submitted the declaration of its Chief Financial Officer, Wayne Wilson, who noted that in comparing the first two quarters of 2012 with the first two quarters of 2013, plaintiff and defendant increased sales by approximately 19%, meaning that defendant's boats obtained an additional 1.8% share of the market to plaintiff's 3.1% gain of market share, respectively [Doc. 9-9 ¶¶ 11-12]. Plaintiff's economic expert, Dr. Robert Mills, used this evidence to conclude that it was NSS, and

33

correspondingly, Surf Gate driving defendant's and plaintiff's respective increased market shares [Doc. 9-6 ¶ 33]. Defendant, in turn, presented the testimony of its own expert, Andrew Carter, who submitted that defendant's market share began to increase prior to the release of NSS, and that it subsequently lost market share in 2013 [Doc. 27-7 ¶¶ 56-59]. Mr. Carter submitted that, rather than the availability NSS, a multitude of factors drove purchasers to purchase a boat from defendant, focusing on defendant's hull, as well as non-product specific factors, such as brand loyalty, the dealer's reputation, and price [*Id.*¶ 72]. In addition, both parties submitted anecdotal evidence as to the manner in which NSS drove or did not drive sales of defendant's boats, in light of the other options and components available on defendant's boats [*See* Docs. 9-3, 9-7, 27-8, 27-9, Doc. 30-1]. Defendant thus argues that, given the innovative nature of its hull design, and its reputation in the industry for service, plaintiff cannot show that NSS is driving defendant's market share increase.

In light of the evidence presented by both parties, at this time the Court cannot determine that there is a likely causal connection between the allegedly infringing components of NSS and plaintiff's alleged harm of a decreased potential to gain market share. While plaintiff argues that NSS is responsible for defendant's increase in market share because the two occurred during the same time period, "[i]t is not enough for the patentee to establish some insubstantial connection between the alleged harm and the infringement and check the causal nexus requirement off the list. The patentee must rather show that the infringing feature drives consumer demand for the accused product."

34

*Apple II*, 695 F.3d at 1375.  Here, plaintiff has not presented enough evidence for the Court to conclude, on the record before it, that NSS is driving consumer demand for defendant's boats, given the fact that NSS is one component of a boat with "many features," *id.* at 1374, and given the evidence that purchasers of defendant's boats are also driven by non-product factors such as dealer familiarity and service.  Although *Apple II* concerned the unified search feature of smart phones, *see id.* at 1372-73, for which there is a substantially a broader market than luxury boats, the Court finds that the reasoning from that case applies with equal force here.  There is insufficient evidence in the record to indicate that the allegedly infringing feature is what drives consumers to purchase defendant's boats.

Plaintiff also advances a theory based upon brand loyalty and consumer habits, arguing that in permitting NSS to be sold, plaintiff is deprived of what it refers to as the "incumbency advantage" it could receive by being in a position to sell not only a first boat to a consumer, but additional boats for years to come, as that consumer trades in for newer models and as that consumer informs his friends and family of his preference for a given manufacturer.  In support of this theory of alleged irreparable harm, plaintiff cites to *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013).  That case concerned digital communication systems with data transceivers capable of receiving various data signals.  *Id.* at 1328.  The district court there characterized the market in which the parties competed as consisting of "design win scenarios," wherein the parties competed to design components for one of four buyers.  *Id.* at 1336.  In this market,

35

winning a design bid precluded the losing party from being a supplier until the next design competition, and also gave an "incumbency effect" to the winning supplier because of the buyer's familiarity with the winner. *Id.* The Federal Circuit, in finding that plaintiff had shown a nexus of infringement with harm, emphasized the fact that the market was "fundamentally different" than the smart phone market present in *Apple I*, given that there was not a steady flow of discrete product sales and that there were only four customers over which to compete. *Id.* at 1337. Thus, the Federal Circuit upheld the district court's grant of a permanent injunction, in light of the characteristics of the market and in light of the fact that plaintiff had already proven infringement on the merits. Here, however, plaintiff has only shown a likelihood of success on the merits on the limited record before the Court, and it is at a much earlier stage of the litigation than the plaintiff in *Broadcom*. The Court finds that *Broadcom* is also inapposite to the facts of this case. The market for recreational inboard boats with wake surf systems is smaller than the market for the smart phones at issue in *Apple I* but is not limited to four customers who continually rely on a small group of suppliers as in *Broadcom*.[8] The incumbency effect from knowing a supplier of a component part and having to regularly interact with that supplier is also different than any buyer preference in purchasing a boat from the same manufacturer. Plaintiff may establish such an effect later in the case. At

---

[8] The Court also questions whether the fact that a boat purchaser might purchase a boat from the same manufacturer after several years has elapsed, under plaintiff's incumbency theory, constitutes the likelihood of "immediate" injury requisite to support a preliminary injunction. *Apple I*, 678 F.3d at 1325.

36

this time, however, the Court merely concludes that plaintiff has not shown a sufficient causal connection between the alleged infringement and the alleged harm.

Plaintiff also submits that it will be subject to immediate reputational harm beyond market share because of the loss of goodwill that will occur absent immediate injunctive relief. Specifically, plaintiff argues that it will suffer reputational damage by no longer being considered an "innovator" and by being unable to support its dealers by being the "exclusive source of Surf Gate technology" [Doc. 31 at 37]. The Court finds, however, that such contentions are not supported by sufficient evidence at this stage of the litigation so as to support a finding of immediate and irreparable harm, particularly in light of the fact that the market has already responded to consumer demand as more manufacturers establish their own wake systems. Finally, the Court finds that plaintiff's expert statements with regard to price suppression do not provide substantial support to plaintiff's claim of price suppression at this time, nor do they illustrate to the Court that the consequences of any such price suppression could not be calculated in determining plaintiff's damages after a trial on the merits. Therefore, having reviewed the evidence in the record in light of the relevant case law, and in weighing the Court's finds with respect to irreparable harm against the Court's findings with respect to plaintiff's likelihood of success, the Court does not find that plaintiff has shown a likelihood of irreparable harm

so as to warrant the imposition of a preliminary injunction, particularly considering the extraordinary nature of such relief under the circumstances of this case.[9]

## III. Conclusion

Accordingly, and for the reasons previously discussed, plaintiff's motion for a preliminary injunction [Doc. 8] is hereby **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[9] Because the Court finds that plaintiff has failed to meet its burden of showing irreparable harm in the absence of a preliminary injunction, the Court need not address the remaining equity factors. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973-74 (Fed. Cir. 1996) ("[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors."). The Court notes, however, that considering the balance of equities and public interest would not alter the Court's conclusion that a preliminary injunction is inappropriate at this juncture.

38